John **PRUITT** et al., Plaintiffs,

v.

**COMMERCIAL CARRIERS, INC.,** and Teamsters Local Union 612, Defendants.

No. CA72–H–152–S.

United States District Court, N. D. Alabama, S. D.

Feb. 15, 1974.

J. R. Moncus, Jr., James H. Hard, IV, Birmingham, Ala., for plaintiffs.

T. Eric Embry, Beddow, Embry & Beddow, Birmingham, Ala., for Teamsters Local 612.

William F. Gardner, Cabaniss, Johnston, Gardner & Clark, Birmingham, Ala. for Commercial Carriers, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HANCOCK, District Judge.

Pursuant to the pretrial order entered on December 11, 1973, this matter came on for hearing on February 12, 1974, on whether the action, originally brought as a class action, should be so maintained. Upon the presentation of the evidence by the plaintiff and the defendants it was obvious to the court that the overwhelming majority of the evidence presented during the hearing dealt with the merits of the controversy, and at the conclusion of the hearing, the cause was submitted by agreement of all parties for the judgment of the court, without the intervention of a jury, on the pleadings, the order on pretrial hearing and the evidence adduced in open court on both the Rule 23 issue and the merits.

After full consideration thereof, the court proceeds to make and enter the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Defendant Commercial Carriers, Inc. (hereinafter referred to as "Commercial") is engaged in the transportation of automobiles, conducting its operations in the State of Alabama only at its Birmingham Terminal. Defendant Teamsters Local Union 612 (hereinafter referred to as "Union") is the collective bargaining representative of the employees of Commercial employed at its Birmingham Terminal.

2. On January 30, 1967, plaintiff, a Negro, was employed by Commercial as a yardman and soon thereafter joined the Union. At that time and continuously until plaintiff's employment terminated in 1969, there were two other employees of Commercial employed as yardmen, one of these was white and the other was black. At times during plaintiff's employment his work week was Saturday through Wednesday, inclusive, with Thursdays and Fridays being his "Saturdays" and "Sundays" with the effect that any work done by plaintiff on a Thursday was at 1½ times regular pay and any work done by plaintiff on Friday was at 2 times regular pay. At other times during his employment plaintiff's work week was Monday through Friday and work done by him on Saturday or on Sunday was then at 1½ or 2 times regular pay. The opportunity to work at premium pay rates was quite desirable, and plaintiff received at least his fair share of premium work.

3. During the period 1967 through 1969, there was a total of approximately 30 employees of Commercial at the Birmingham Terminal. In addition to the three yardmen (including plaintiff), Commercial employed certain persons,

designated as "casuals," who performed work similar to the work of yardmen. The primary difference between a casual and a yardman is that a casual is not guaranteed any specific amount of work during a given work week but is simply called from time to time to handle work which the three regularly employed yardmen are unable to handle in their normal work assignment. During the period 1967 through 1969, there were normally five to eight casual employees of Commercial, none of whom were black, although since 1969 four or five blacks have been employed as casuals and Commercial presently employs one black casual. Persons employed as casuals normally, though not necessarily, have less seniority than yardmen.

4. Of the three yardmen employed by Commercial during the period 1967 through 1969, plaintiff had the least seniority. During 1967 and most of 1968, the customary hours of work for the three yardmen were from 8:00 A.M. until 4:30 P.M., five days a week (although the five day work week varied as indicated in paragraph 2 above). During the fall of 1968, Commercial determined that it needed to have one of the three yardmen report for work at 9:00 o'clock A.M. and leave work at 5:30 o'clock P.M. and plaintiff was advised that these would be his new work hours. Plaintiff objected to working these new work hours and as a result of this objection, he refused to work and was discharged. A grievance was filed by the Union with regard to the discharge, and thereafter plaintiff was reinstated since the contract procedure for modification of working hours had not been followed by Commercial. During the spring of 1969, Commercial again determined that one of the three yardmen should report to work at 9:00 A.M. and leave work at 5:30 P.M. This time Commercial followed the contract procedure by "posting" the proposed change of working hours to allow the three yardmen to bid on the new working conditions. None of the three yardmen bid for the revised working hours. Since plaintiff pos-

sessed the least seniority of the three yardmen, he was assigned the working hours of 9:00 A.M. to 5:30 P.M. and was advised by the Terminal Manager for Commercial of the new working hours. Monday, March 31, 1969, was the first working day covered by the revised hours of employment. On March 31, 1969, plaintiff appeared for work at his customary 8:00 A.M. starting time and was told by the Terminal Manager for Commercial that he could not begin work until 9:00 A.M. pursuant to the revised working hours for him which had been posted and approved pursuant to the Union procedure. Plaintiff left work without waiting until the scheduled 9:00 A.M. starting time, saying that he would not work the new hours and that he would come back to work only when his hours were changed back to the 8:00 A.M. starting time. Plaintiff never returned to work again. Seventy-two hours later, pursuant to the normal policy of Commercial applied to blacks and whites alike, plaintiff was dropped from the payroll of Commercial with the notation "Voluntary Quit." Commercial's handling of his failure to report to work and its dropping him from the payroll with the notation "Voluntary Quit" was similar to its handling of comparable situations involving former white employees of Commercial.

5. Neither with regard to the second modification of plaintiff's hours of employment nor with regard to the subsequent failure of plaintiff to accept the modification, leading to his termination of employment, did plaintiff request the Union to file or process a grievance on his behalf. Moreover, while plaintiff maintained in his testimony that he was not properly treated by the Union, he expressly stated that such improper treatment was not related to the fact that plaintiff is black. In any event, it is clear the Union ably pursued matters on behalf of plaintiff when requested so to do. The Union successfully processed grievances for plaintiff which resulted in his reemployment (after his first ter-

mination of employment in the fall of 1968) and which resulted in his receipt of $274 backpay.

6. During the period 1967 through 1969, included among the approximate 30 employees of Commercial at its Birmingham Terminal were approximately 18 drivers (none of whom were black), 5 to 8 casuals (none of whom were black) and 3 yardmen (two of whom, including plaintiff were black and one of whom was white). During this period approximately 10 to 15 black persons sought employment as casuals and none of them were hired, although there is no evidence that any of them were qualified for the position as a casual, such as possessing a driver's license. Likewise there is no evidence that Commercial failed to offer any of them a job or that any such failure was related to race or color.

7. There was no evidence presented to the court from which the court can find that anyone, black or white, was afforded an opportunity to transfer, promote or advance with Commercial other than in strict conformity with the provisions of the contract between the Union and Commercial and without regard to the race or color of the employee.

8. There was no evidence presented to the court from which the court can find that qualified black persons have applied for employment with Commercial, and there was no evidence that black persons have been refused employment because of their color or race.

9. There was no evidence presented to the court from which the court can find that black persons have refused to apply for positions with Commercial because of the general reputation that Commercial refuses to employ black persons.

10. There was no evidence presented to the court from which the court can find that either defendant harassed plaintiff or treated him in any way other than the treatment afforded all employees of Commercial, white or black.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of this action and of the parties hereto.

2. Plaintiff has failed to discharge the burden of satisfying the requirements of Rule 23(a) of the Federal Rules of Civil Procedure. Specifically plaintiff has failed to demonstrate that the class he seeks to represent is so numerous that the joinder of all members is impracticable. On the contrary, there is sufficient evidence to support the conclusion that the total number of members of the putative class is materially less than 30 persons. An additional, and equally compelling, reason to conclude that the prerequisites of Rule 23(a) have not been satisfied is the inescapable conclusion that plaintiff is not in a position fairly and adequately to protect the interests of the class he seeks to represent. His employment with Commercial lawfully terminated in the spring of 1969, approximately five years ago. This action was filed approximately two years ago. The evidence demonstrates that the hiring practices of Commercial, particularly with the regard to the hiring of blacks, are different now from those in existence when plaintiff worked for Commercial. Certainly the results of the hiring practices are different. There is no showing that plaintiff, as the claimed representative of blacks who are currently employed by Commercial, is aware of the conditions of employment with regard to blacks that exist at this time. The court concludes that this plaintff has not met the burden of establishing a right to proceed with a class action under Rule 23 of the Federal Rules of Civil Procedure since none of the requirements of Rule 23(a) have been satisfied. The court therefore ORDERS that this case is not to be maintained or considered as a class action.

3. Plaintiff has likewise failed to meet the burden of proof resting squarely upon him which burden must be satisfied to entitle plaintiff to relief, as an individual, for racial discrimination against him by Commercial. Defendant Commercial did not fail or refuse to hire plaintiff because of his race or color. Defendant Commercial did not discharge plaintiff or otherwise discriminate against him with respect to his compensation, terms, conditions or privileges of employment because of his race or color. Plaintiff's final termination of employment with Commercial was lawful and was occasioned by the fact that plaintiff simply quit. No racially inspired action on the part of Commercial caused such quitting to be anything other than voluntary. Defendant Commercial did not limit, segregate or classify its employees, including plaintiff, in any way which would deprive or tend to deprive plaintiff of employment opportunities or otherwise adversely affect his status as an employee, because of his race or color.

4. Plaintiff has likewise failed to meet the burden of proof resting squarely upon him which burden must be satisfied to entitle him to relief, as an individual, for racial discrimination against him or for failure adequately to represent him by the Union. Defendant Union has not excluded or expelled plaintiff from its membership because of his race or color. Defendant Union has not caused or attempted to cause Commercial to discriminate against plaintiff in any respect. And Defendant Union has not violated any duty of fair representation owing to plaintiff.

5. Plaintiff has not shown himself to be entitled to any relief prayed for in his complaint. This is a case where plaintiff has not presented facts to support his claim for relief, not because of lack of preparation or presentation but because such facts simply do not exist.

An appropriate order denying plaintiff relief and dismissing this action will be entered.